**UNITED STATES**

**v.**

**Michael S. WATSON, 222 50 3249 Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 90 3661.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 15 May 1990.

Decided 12 June 1992.

LT Richard D. Ziegler, JAGC, USNR, Appellate Defense Counsel.

LT Lisa Higdon, JAGC, USNR, Appellate Defense Counsel.

LT Ralph G. Stiehm, JAGC, USNR, Appellate Government Counsel.

*En banc.*

ORR, Senior Judge:

In accordance with his pleas, the appellant was convicted of disobeying a lawful general order by possessing and carrying a sword with a 36-inch blade on Marine Corps Base, Camp Pendleton, of conspiring to commit forgery and larceny, of stealing a wallet valued at $120, and of forging signatures on seven different charge card sales receipts in violation, respectively, of Articles 92, 81, 121, and 123, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 881, 921, 923 (1988). He was sentenced by the military judge sitting alone to confinement for 6 months, reduction to pay grade E–1, forfeiture of all pay and allowances, and a bad-conduct discharge.

Before this Court, the appellant assigns four errors [1] and we specified an additional issue [2] based on the Secretary of the

1. I. THE MILITARY JUDGE ERRED BY ACCEPTING APPELLANT'S PLEA OF GUILTY TO VIOLATING A LAWFUL GENERAL ORDER WHICH PROHIBITED THE ON-BASE TRANSPORT OF A KNIFE WITH A BLADE IN EXCESS OF TWO AND ONE-HALF INCHES WHERE APPELLANT'S STATEMENTS DURING THE PROVIDENCE INQUIRY INDICATED THAT HE TRANSPORTED, ON BASE, A SOUVENIR SWORD PURSUANT TO AN ORDER FROM HIS PLATOON SERGEANT TO REMOVE THE SWORD FROM THE BARRACKS.
II. THE CONVENING AUTHORITY ERRED IN TAKING ACTION BEFORE ALLOWING APPELLANT TEN DAYS FROM THE DATE OF THE ADDENDUM STAFF JUDGE ADVOCATE'S RECOMMENDATION TO SUBMIT MATTERS IN RESPONSE THERETO.
III. THE MILITARY JUDGE ERRED BY ACCEPTING APPELLANT'S PLEA OF GUILTY TO VIOLATING A LAWFUL GENERAL ORDER WHERE THE ORDER WAS, IN FACT, SIGNED BY THE CHIEF OF STAFF. [Citation omitted.]
IV. THE CONVENING AUTHORITY ERRED BY TAKING ACTION WHERE THE TWO STAFF JUDGE ADVOCATE RECOMMENDATIONS REPRESENTED TO THE CONVENING AUTHORITY THAT APPELLANT HAD NOT SUBMITTED ANY MATTERS FOR HIS CONSIDERATION WHEN, IN FACT, APPELLANT HAD SUBMITTED TO THE NAVAL CLEMENCY AND PAROLE BOARD A CLEMENCY REQUEST WHICH, PRIOR TO THE RECOMMENDATIONS, HAD BEEN ATTACHED TO AND MADE PART OF THE RECORD OF TRIAL FOR THE CONSIDERATION OF THE CONVENING AUTHORITY.

2. WAS THE CONVENING AUTHORITY'S MEMORANDUM DESIGNATING THE COMMANDING GENERAL, MARINE CORPS BASE, CAMP PENDLETON, AS THE GENERAL COURT-MARTIAL AUTHORITY FOR SERVICEMEMBERS ASSIGNED TO 1ST MARINE DIVISION (REAR) AUTHORIZED BY JAGMAN 0145b(2) (SUBPARAGRAPH 0145b(2) OF JAG INSTRUCTION 5800.7B OF 1 JULY 1978)?
A. WAS THE COMMANDING GENERAL, MARINE CORPS BASE, CAMP PENDLETON, AN OFFICER EXERCISING GENERAL COURT-MARTIAL JURISDICTION OVER THE COMMAND OF THE COMMANDING GENERAL, 1ST MARINE DIVISION, IN AUGUST 1990?
B. WAS THE COMMANDING GENERAL, MARINE CORPS BASE, CAMP PENDLETON, AN OFFICER EXERCISING GENERAL COURT-MARTIAL JURISDICTION OVER THE 1ST MARINE DIVISION (REAR) IN AUGUST 1990 AND, IF SO, BY WHAT AUTHORIZATION?
C. IF THE PERSON WHO NORMALLY WOULD TAKE ACTION ON A RECORD OF TRIAL AS THE CONVENING AUTHORITY IS HIMSELF AN OFFICER EXERCISING GENERAL COURT-MARTIAL JURISDICTION, DID JAGMAN 0145b(2) AUTHORIZE THAT OFFICER TO DIRECT AN ELEMENT OF HIS COMMAND TO FORWARD RECORDS OF TRIAL FOR CONVENING AUTHORITY ACTIONS TO AN OFFICER EXERCISING GENERAL COURT-MARTIAL JURISDICTION

Navy's regulations implementing Article 60(c)(1), UCMJ,[3] and Rule for Courts–Martial (R.C.M.) 1107(a), Manual for Courts–Martial (MCM), United States, 1984. Because our disposition of the specified issue requires a new convening authority's action, we need not address the errors assigned by the appellant. We do suggest, however, that in any subsequent action on this case particular consideration be given to that portion of the appellant's first assignment which concerns his ability to plead guilty providently to the on-base possession of a sword in violation of a rather ambiguous paragraph of a base order that does not mention or otherwise identify swords.

The specified issue concerns the post-trial handling of the appellant's record of trial. The staff judge advocate (SJA) for the convening authority, Commanding General, 1st Marine Division, prepared his post-trial recommendation on 18 August 1990 and served copies of that recommendation on the trial defense counsel and the appellant on 24 August and 5 September 1990, respectively. Also on 24 August, the convening authority entered into a memorandum of understanding (MOU) with the Commanding General, Marine Corps Base, Camp Pendleton, (CG, MCB Camp Pendleton) for the latter general officer to act as the general court-martial convening authority for elements of the 1st Marine Division that remained at Camp Pendleton as 1st Marine Division (Rear) while the 1st Marine Division and its Commanding General deployed as part of Operation Desert Shield.[4] Sometime thereafter, the record of trial in the appellant's case was forwarded to the SJA for CG, MCB Camp Pendleton, and that SJA submitted his post-trial recommendation[5] on 1 November 1990. Pursuant to the MOU, CG, MCB Camp Pendleton, then acted on the case on 2 November 1990.

Our specified issue questions whether the MOU between these two general court-martial authorities could properly transfer the authority to take the post-trial action on this case in light of the Secretary of the Navy's regulations implementing Article 60(c), UCMJ, and R.C.M. 1107(a). These regulations are promulgated in the Manual of the Judge Advocate General of the Navy (JAGMAN). The version of the JAGMAN applicable to the appellant's case is reflected in Change 6 of 22 April 1987 to Judge Advocate General (JAG) Instruction 5800.7B of 1 July 1978. Section 0145, entitled "Initial review and action," is found in Subpart B3, "POST–TRIAL MATTERS," of Part B, "COURTS–MARTIAL," of Chapter I, "REGULATIONS IMPLEMENTING AND SUPPLEMENTING THE MANUAL FOR COURTS–MARTIAL." Under the heading, "When impracticable for convening authority to act," subsection 0145b provides:

(1) For commands in the Navy chain of command, if it is impracticable for the person who normally would take action as convening authority to do so, that person shall cause the record of trial to be forwarded in the absence of specific direction to the contrary by an officer authorized to convene general courts-martial and superior in the chain of command to the convening authority, to the area coordinator or a subordinate commander authorized to convene general courts-martial and designated by the area coordinator for this purpose. For mobile units, the area coordinator or designated subordinate commander is the area coordinator or designated subordinate commander most convenient at the time of forwarding of the record. The letter or message which causes the record to be so forwarded shall contain a statement of the reasons why the normal convening authority could not act on the

WHO IS NOT OTHERWISE "OVER THE COMMAND"?

3. 10 U.S.C. § 860(c)(1) (1988).

4. The 24 August MOU was clarified by a 29 August 1990 supplement that extends the application of the initial MOU to post-trial actions.

5. The SJA for the substitute convening authority merely adopted the earlier 18 August 1990 recommendation as his own.

record, and any other matters deemed appropriate by the forwarding officer.

(2) For commands in the chain of command of the Commandant of the Marine Corps, if it is impracticable for the person who normally would take action as convening authority to do so, that person shall cause the record of trial to be forwarded to an officer exercising general court-martial jurisdiction *over the command.* The letter or message which causes the record to be so forwarded shall contain a statement of the reasons why the normal convening authority could not act on the record, and any other matters deemed appropriate by the forwarding officer.

(Emphasis added.) The identical provision now appears in Section 0151b of the current JAGMAN, JAG Instruction 5800.7C of 3 October 1990. The "letter or message" in this case is the 24 August 1990 memorandum of understanding and its 29 August 1990 supplement, which were enclosures to the SJA's 1 November 1990 recommendation to CG, MCB Camp Pendleton.

Although the regulation applicable to the Marine Corps does not expressly require the officer exercising general court-martial jurisdiction over the command to take the action, we find no reasonable basis to conclude otherwise. There would be no purpose in having one regulation for the Navy, which expressly permits an officer exercising general court-martial jurisdiction over the command convening the court-martial to direct where the record of trial may be sent for the post-trial action, and a separate regulation for the Marine Corps, which contains no such permission, if the authority to send the record elsewhere for the post-trial action could be read into the latter provision by implication.

Our position is also supported by the historical development of the language in the regulation applicable to the Marine Corps. When JAG Instruction 5800.7B was initially promulgated in 1978, a special court-martial that resulted in an approved bad-conduct discharge but which was convened by an officer who was *not* an officer exercising general court-martial jurisdiction had to be forwarded for review to an officer exercising general court-martial jurisdiction. ¶ 94a(3), MCM, 1969 (Rev.).[6]

(a) For activities in a Navy chain of command....

(b) For activities in the chain of command of the Commandant of the Marine Corps, review will be accomplished by the officer *ordinarily* exercising general court-martial jurisdiction over the command.

*In the event review by any of the foregoing is impracticable ... any other officer authorized to convene general courts-martial may be requested to accept records of trial for review.*

.    .    .    .    .

Section 0125b(2), JAG Instruction 5800.7B of 1 July 1978 (emphasis added). This provision remained intact until the promulgation of the Interim Change of 17 July 1984 to JAG Instruction 5800.7B following the substantial revision of post-trial review procedures in the 1983 modification of the UCMJ, Military Justice Act of 1983, Pub.L. No. 98–209, 97 Stat. 1393, and the promulgation of the 1984 MCM. This Interim Change first used the language we have already quoted from Change 6 to the 1978 JAGMAN and deleted both the word "ordinarily" and the entire provision concerning what was to occur if it was "impracticable" for the review to be conducted by the officer exercising general courts-martial authority over the command. We have no

6. "The Secretary concerned may, however, provide by regulation for forwarding of the record in appropriate cases to any officer exercising general court-martial jurisdiction, who shall be considered 'the officer exercising general court-martial jurisdiction over the command' within the meaning of Article 65(b) [of the 1951 UCMJ as amended in 1968]." ¶ 94a(3), MCM, 1969 (Rev.). The post-trial review of general courts-martial prior to 1984 fell under the general language of Article 60 of the 1951 UCMJ, as amended, which stated: "After a trial by court-martial the record shall be forwarded to the convening authority, and action thereon may be taken by the person who convened the court, a commissioned officer commanding for the time being, a successor in command, or any officer exercising general court-martial jurisdiction." 10 U.S.C. § 860 (1976).

basis to assume such deletions were inadvertent or unintentional.

■ From information submitted to us in response to other orders we have issued in this case, we find that the 1st Marine Division was and is a command in the chain of command of the Commandant of the Marine Corps for the purposes of JAGMAN Section 0145b, as was 1st Marine Division (Rear), and that neither the 1st Marine Division nor the 1st Marine Division (Rear) was in a chain of command that included CG, MCB Camp Pendleton, at any time relevant to the post-trial processing of the appellant's case.[7] Consequently, the MOU attempted to transfer responsibility for taking post-trial actions on courts-martial contrary to the Secretary of the Navy's implementing regulation. The issue then arises as to the legal significance of the purported action by CG, MCB Camp Pendleton. To put the issue another way: Does this Court have a valid convening authority's action approving the findings and sentence on which the Court may properly base its review of the appellant's case under Article 66(c), UCMJ, 10 U.S.C. § 866(c)?[8] We answer the question in the negative.

Article 60(c)(1) of the UCMJ states:

> The authority under this section to modify the findings and sentence of a court-martial is a matter of command prerogative involving the sole discretion of the convening authority. *Under regulations of the Secretary concerned,* a commissioned officer commanding for the time being, a successor in command, or any person exercising general court-martial jurisdiction may act under this section in place of the convening authority.

10 U.S.C. § 860(c)(1) (1988) (emphasis added.) In addition, Article 60(c)(2) also provides:

> Action on the sentence of a court-martial shall be taken by the convening authority *or by another person authorized to act under this section.* Subject to regulations of the Secretary concerned, such action may be taken only after consideration of any matters submitted by the accused under subsection (b) or after the time for submitting such matters expires, whichever is earlier. The convening authority or other person taking such action, in his sole discretion, may approve, disapprove, commute, or suspend the sentence in whole or in part.

10 U.S.C. § 860(c)(2) (1988) (emphasis added). These provisions express the Congressional intention to delegate to the Secretary concerned the authority to further modify who "may act under this section in place of the convening authority" within the parameters of the categories expressly delineated by Congress in Article 60(c)(1).

R.C.M. 1107(a) states that the convening authority shall act on the sentence and the

---

7. Prior to our order requesting additional information concerning the various chains of command that might apply in this case, the Government argued that R.C.M. 601 and the discussion thereunder would permit any U.S. Marine Corps officer exercising general court-martial jurisdiction to take action on this case as the convening authority. While such a broad interpretation may apply to the convening of a court-martial in the first instance, we do not think R.C.M. 601 and the discussion of that Rule were intended either to obviate the more restrictive language of Article 60(c), UCMJ, and R.C.M. 1107(a) or to permit the indiscriminate substitution of officers exercising general court-martial jurisdiction following the conclusion of the trial. *See United States v. Delp,* 31 M.J. 645 (A.F.C.M.R. 1990); *cf. United States v. Gates,* 21 M.J. 722 (A.C.M.R.1985). Likewise, we find no merit in the Government's alternative contention that CG, MCB Camp Pendleton, was empowered to act in this case by virtue of his coordinating

responsibilities as "Senior Marine Officer Present" in the Camp Pendleton area. Such an argument would render meaningless, as we have already noted, the obvious distinction intended by the Secretary in promulgating a separate implementing regulation for commands in the Navy chain of command, vice commands in the chain of command of the Commandant of the Marine Corps, which expressly authorizes forwarding records of trial to an area coordinator authorized to convene general courts-martial for post-trial reviews. The implementing language applicable to the Navy differs significantly on this point and would permit the substitution that occurred in this case even without an MOU.

8. Article 66(c), UCMJ, 10 U.S.C. § 866(c), provides, in part: "In a case referred to it, the Court of Military Review may act only with respect to the findings and sentence as approved by the convening authority...."

findings unless it is impracticable, and "[i]f it is impracticable for the convening authority to act, the convening authority shall, in accordance with such regulations as the Secretary concerned may prescribe, forward the case to an officer exercising general court-martial jurisdiction who may take action under this rule." Although the placement of the reference to the Secretary's regulations in R.C.M. 1107(a) alone might suggest that the Secretarial authority described in the Rule is limited to prescribing the manner or method of forwarding a case, the statute more clearly indicates otherwise, and the Secretary of the Navy, through the substance of his regulations, obviously agrees.

■ An administrative regulation issued pursuant to a statutory authorization has the full force and effect of the law. *See United States v. St. Bernard Parish*, 756 F.2d 1116, 1124–25 (5th Cir.1985), *cert. denied*, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986); *United States v. Wheeler*, 27 C.M.R. 981, 989 (A.B.R.1959); *United States v. Christian*, 22 C.M.R. 780, 784 (A.B.R.1956). "It is elemental that '[i]f the words used in the statute convey a clear and definite meaning a court has no right to look for or to impose a different meaning.'" *United States v. Graham*, 16 M.J. 460, 462 (C.M.A.1983) (quoting *United States v. Dickenson*, 6 C.M.A. 438, 449, 20 C.M.R. 154, 165 (1955)). This "elemental" rule applies equally to the application of an administrative regulation issued pursuant to a statutory authorization. So also does the rule that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous...." 2A Norman J. Singer, *Sutherland's Statutory Construction* § 46.06 (5th ed. 1992). We are not at liberty to ignore part of the Secretary's implementing regulation simply because we think neither he nor Congress could have

intended a particular result that flows from a clear and obvious application of the implementing regulation.[9]

We have found no cases applying or interpreting this aspect of Article 60(c) of the Code. The Government has cited several cases to us, however, that concern other articles of the UCMJ that address the designation of officers authorized to convene courts-martial and the effect of administrative regulations in the application of those articles. In *United States v. Jette*, 25 M.J. 16 (C.M.A.1987), the Court of Military Appeals declined to attach jurisdictional significance to U.S. Air Force regulations affecting the authority of the Air Force officer who had convened the court-martial "in the absence of ... [the regulations'] express characterization as ... [jurisdictional] by Congress." 25 M.J. at 18. In *Jette*, however, the Court was concerned with Article 23(a)(4), UCMJ, 10 U.S.C. § 823(a)(4) (1988), and service regulations concerning the assumption of command when an officer who had temporarily but properly relieved the commanding officer of a combat support group was himself relieved when the commanding officer returned and purported to amend the special court-martial convening order issued by the officer who had been in temporary command. Since the commanding officer of a group of the Air Force is specifically empowered by Congress in Article 23(a)(4) without qualification to convene special courts-martial, the Court stated that "Article 23(a)(4), unlike Article 23(a)(7) [which authorizes the convening of special courts-martial by commanding officers of other, unspecified commands when empowered by the Secretary concerned], reflects Congress' concern for the realities of command, not the intricate dictates of service regulations." 25 M.J. at 19. In reaching that conclusion, the Court of Military Ap-

---

**9.** Our brothers who dissent from our opinion would give little or no meaning to the Secretary's use of the phrase "over the command" because, in their view, the phrase does not implement what they perceive, without any legislative history to guide them, to be the purpose of Congress in amending Article 60 in 1983. Our function as a court of law is to interpret and apply the law as it has been enacted or promulgated consistent with applicable precedent. We are not at liberty to re-craft the Code or the Secretary's implementing regulation to make either of them more flexible in time of war or any other time. "As a court ... we are not involved in the merits of ... policy." *United States v. Henderson*, 34 M.J. 174, 178 (C.M.A.1992).

peals overturned the Air Force Court of Military Review's decision that the commanding officer had not re-assumed command in accordance with those service regulations and was, therefore, not empowered to act as a convening authority. *Id.*

The Court of Military Appeals in *Jette* simply determined as a practical matter whether the commanding officer had in fact re-assumed command and was not deterred by the technical requirements of the service regulations in question. The Court employed the same approach 2 years later in *United States v. Yates*, 28 M.J. 60 (C.M.A.1989), where the deputy post commander at Fort Sheridan issued an amended convening order during the temporary absence of the commander even though the deputy was not the most senior officer present for duty at the fort when the order was issued. In construing Article 22(a)(8), UCMJ, 10 U.S.C. § 822(a)(8) (1988), which authorizes the convening of general courts-martial by "any other commanding officer designated by the Secretary concerned", the Court found that the Secretary of the Army had designated "the commanding officer of Fort Sheridan" pursuant to Congress' delegation but concluded that "[t]he realities of command, not unexecuted technical possibilities, best satisfy the purpose of these statutes." 28 M.J. at 63 (citation omitted). Consequently, the Court applied the presumption of regularity and found no illegality in the fact that the deputy was 29 days junior to another officer present for duty at the command.

The secretarial regulations the Court of Military Appeals declined to apply in *Jette* and *Yates* were *not* regulations Congress contemplated when Articles 22(a) and 23(a) were enacted. This is readily apparent in *Jette* where the subdivision of Article 23(a) on which the authority to convene the court-martial in that case was based did not include any reference to the exercise of secretarial discretion. Although the authority to convene the court in *Yates* did rely upon a specific delegation of authority to the secretary concerned, the Court of Military Appeals declined to look behind the ostensible exercise of that authority to determine whether technical requirements for ascending to command, which were entirely separate and apart from the Secretary of the Army's designation of the commanding officer of Fort Sheridan as an officer authorized to convene general courts-martial pursuant to the Congressional delegation, had been satisfied.

Unlike *Jette* and *Yates*, we are not faced with some technical irregularity concerning a particular individual who may or may not have been "in command" or "in the chain of command" but with Congress' express proviso contemplating the issuance of Secretarial regulations further implementing the Congressional delineation of who may act in the place of the convening authority when post-trial action is to be taken on a particular case [10] and an implementing action by the Secretary pursuant to that delegation. Consequently, we are not at liberty to ignore as "non-jurisdictional" the Secretary of the Navy's restriction that for such actions, for commands in the chain of command of the Commandant of the Marine Corps, records of trial shall be "forwarded to an officer exercising general court-martial jurisdiction over the command" vice the broader category of "any person exercising general court-martial jurisdiction" as used by Congress in Article 60(c)(1).[11]

---

10. This Congressional delegation in Article 60, UCMJ, was added to the UCMJ in the substantial revision of post-trial procedures for trials by courts-martial that occurred in 1983. Military Justice Act of 1983, Pub.L. No. 98–209, § 5(a)(1), 97 Stat. 1393, 1396. The Court of Military Appeals' decision in *Jette* may have been determinative of our specified issue under the previous version of Article 60, which contained no delegation of authority to service Secretaries. 10 U.S.C. § 860 (1982).

11. We are aware of the environment in which this MOU was concluded and that the officers superior to the convening authority in this case were, at that time, involved in the primary function of the armed forces to mobilize for and engage in armed conflict. We appreciate the Government's desire for flexibility in such circumstances, but we can only assume that the Secretary had other good reasons for imposing the limitation he expressed in Section 0145b(2) of the JAGMAN and not imposing it in Section 0145b(1). We are also aware that the Secretary

Accordingly, the action of Commanding General, Marine Corps Base, Camp Pendleton, dated 2 November 1990, is set aside. The record of trial will be returned to the Judge Advocate General for a new action by Commanding General, 1st Marine Division, or a different convening authority in accordance with Article 60(c)–(e), UCMJ.

Chief Judge WILLEVER, and Judges REED, MOLLISON and LAWRENCE concur.

FREYER, Senior Judge (dissenting):

I do not dispute the majority's conclusion that the Memorandum of Understanding violated section 0145b(2) of the JAG Manual. Moreover, since there is not the slightest reason to believe that the Secretary would have been unreceptive to a request to grant an immediate exemption from section 0145b(2) to meet the needs of units deploying to Southwest Asia, I deem any argument based on supposed exigencies attending the events in Southwest Asia to be invalid as a basis for resolution of the technical legal issue before this Court.

As I read the current version of Article 60(c)(1), Uniform Code of Military Justice (UCMJ), it authorizes three classes of officials to take substitute convening authority actions and provides that they shall do so "[u]nder regulations of the Secretary concerned[.]" It is unclear precisely what the Congress was trying to accomplish by its addition of the quoted language, but it seems clear enough that it relates exclusively to the *manner* in which the granted jurisdiction is to be exercised, as distinguished from being either a condition precedent to the existence of jurisdiction, such as Article 23(a)(7), UCMJ's grant of jurisdiction to an officer "when empowered by the Secretary concerned[,]" or a condition subsequent whereby jurisdiction may be lost, such as Article 23(b)'s provision that, "[i]f any such officer is an accuser, the court shall be convened by superior competent authority[.]" Absent any con-

trary indication of its meaning, I am inclined to interpret Article 60(c)(1) as affording the Secretaries some administrative power to prescribe pathways of substitute review, but without any concomitant power to annul the subsisting statutory grant of jurisdiction to any of the three classes of officials listed in Article 60(c)(1). Consequently, I also interpret the words "another person authorized to act under this section" in Article 60(c)(2) to include the same three classes of officials.

A service Secretary may wish to prescribe pathways of substitute review simply to define responsibilities and inform convening authorities where to forward records of trial in certain contingencies; otherwise, addressees might refuse to accept them, or superiors squabble among themselves over which one should exercise substitute review responsibilities in a particular case or class of cases. Considerations of workload, operational responsibilities, geographical location, and staffing, among others, may also enter into such a Secretarial decision. None of these practical considerations, in my judgment, rises to the level of creating a jurisdictional issue.

In the Navy, it has been traditional to "protect" senior administrative commanders of operating forces, as well as operational commanders, from being "burdened" with military justice and other "administrative" and support functions; hence, the concept of area coordination was developed to relieve those commanders of these and other supposed distractions. In the Marine Corps, however, even senior commanders apparently regard involvement in military justice functions as an integral responsibility of command.

Section 0145b of the JAG Manual reflects this difference in attitude towards military justice functions and accedes to the respective institutional preferences of the Navy and the Marine Corps. Consequently, even assuming, *arguendo*, that

---

continued the same limitation in his 1990 implementation of Article 60(c), which was ultimately promulgated several months after Operation Desert Shield began. If the Government now

questions the wisdom of the existing implementation, the issue may be raised to the Secretary anew, just as it could have been on or about 24 August 1990 in lieu of proceeding by an MOU.

Article 60(c)(1) does empower the Secretary to divest particular officials of substitute review jurisdiction, I still view section 0145b as just a "housekeeping" regulation, not a purported divestiture of jurisdiction. It should also be noted that neither the Constitution nor any statute required the Secretary to adopt section 0145b, and that such regulation ostensibly does not exist for the protection of the accused. *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). If, indeed, section 0145b did exist for the protection of the accused or arise from any principled Secretarial philosophy of substitute review, why is it different for the Navy and the Marine Corps?

I agree with the majority that regulations should be followed, and so, for the record, I do not "condone" the Memorandum of Understanding. I do suggest, however, that a better-than-frivolous argument can be made that the "shall cause the record of trial to be forwarded" language of section 0145b(2) merely gives the designated addressee control, practically akin to a right of first refusal, over the substitute review of the class of records concerned and does not necessarily preclude such addressee from reassigning substitute review responsibility in a particular case to a different qualified reviewing authority in the same or another chain of command, with the latter's consent, where appropriate. Viewed in that light, the Memorandum of Understanding would be, in effect, nothing more than such a reassignment of substitute review responsibility, on a provisional basis, once for all.[1] Although I do not happen to agree with that argument, I do

regard the substitute review by the base commander in this case as, at worst, a technical violation scarcely deserving to be equated, in its character or its consequences, to a flouting of Secretarial authority.

In my opinion, the action of the substitute convening authority is valid, and the case should be reviewed on its merits without further proceedings.

Judge HOLDER concurs.

STRICKLAND, Senior Judge (dissenting):

I dissent. The "technical" resolution of this case by my brethren ignores the realities of command and reaches a conclusion which I do not believe was ever intended by Congress in enacting Article 60, Uniform Code of Military Justice, 10 U.S.C. § 860, or by the Secretary of the Navy in implementing Article 60.

During August of 1990, the 1st Marine Division deployed to Southwest Asia as a part of Operation Desert Shield. The next superior general court-martial convening authority in the operational chain of command, the Commanding General, I Marine Expeditionary Force, deployed as well. In fact, all of I Marine Expeditionary Force deployed to Operation Desert Shield, which is the first time an entire Marine Expeditionary Force has deployed since the III Marine Expeditionary Force was reactivated on 6 May 1965, at Da Nang, Republic of Vietnam.[1]

In a normal, nondeployed peacetime status, the 1st Marine Division is within two chains of command—an operational chain

---

1. Since 1st Marine Division, but not Fleet Marine Force, Pacific, was a signatory to the MOU, this characterization would be literally true in the case of a special court-martial involving a bad-conduct discharge convened by a unit subordinate to 1st Marine Division, which would be forwarded to 1st Marine Division for substitute review, but not for a case convened by 1st Marine Division, itself, which would be forwarded to Fleet Marine Force, Pacific, for substitute review. In light of the fourth paragraph of the affidavit of Colonel J.E. Switzer, Jr., U.S. Marine Corps Reserve, it appears that both Fleet Marine Force, Pacific, and even Headquarters, U.S. Marine Corps, were knowledgeable of the

MOU and, by taking no action to disapprove it, at least tacitly declined to exercise what has been analogized to a right of first refusal, thereby allowing this and other like cases to be reviewed by Marine Corps Base, Camp Pendleton. Thus, the ostensible Secretarial objectives, namely, that there exist an established pathway of substitute review consistent with Article 60(c)(1), and that conflict with and among superiors be avoided, have been fully satisfied.

1. United States Marine Corps Lineage of III Marine Amphibious Force of 13 September 1984.

and an administrative chain. The operational chain of command superior to 1st Marine Division (all of whom are general courts-martial convening authorities) includes the Commanding General, I Marine Expeditionary Force, the Commanding General, Fleet Marine Force Pacific, and extends upward through the Fleet Commander and the Commander-in-Chief of the Joint Command.[2] The Commandant of the Marine Corps is the superior of the Commanding General, 1st Marine Division in the administrative chain of command.

Marines are deployed throughout the world virtually every day of the year in peacetime. It is normal practice, identical to what occurred in this case, for the deploying unit to leave behind those Marines who are pending trial by court-martial. However, because the deploying units are relatively small in size, most often a Marine Expeditionary Unit, the superior general court-martial convening authority remains nondeployed and collocated with the accused. Consequently, in peacetime, the general court-martial convening authority can take action with relative ease when it is impracticable for the original convening authority to act due to his deployed status.

The nature of Operations Desert Shield and Desert Storm, however, presented unique problems not encountered in a peacetime environment. Once deployed, the operational chain of command for the Commanding General, 1st Marine Division included the Commanding General, I Marine Expeditionary Force and the Commander-in-Chief, United States Central Command, both of whom were deployed to Saudi Arabia as well. This was a crisis situation and the convening authority and his superiors were preparing for whatever contingencies might be required to remove Iraq's presence from Kuwait. The superior in the administrative chain of command remained the Commandant of the Marine Corps and he too was involved in this crisis situation. The question in this case becomes whether it was the intent of Congress or the Secretary of the Navy to require these general officers, who were preparing to go to war, to act in this case when a general officer, whose duties entailed commanding a Marine Corps base and its personnel at a stateside location out of harms way, was collocated with the accused? I believe the answer to this question is no.

When Congress enacted the Uniform Code of Military Justice,[3] Article 60 of this code was taken primarily from Article 47(e) of the Articles of War.[4] No similar provision existed in the Articles for the Government of the Navy. *See* S.Rep. No. 486, 81st Cong., 1st Sess. 26 (1949); H.R.Rep. No. 491, 81st Cong., 1st Sess. 29 (1949). As first enacted, Article 60 provided:

> Art. 60. Initial action on the record.
>
> After every trial by court-martial the record shall be forwarded to the convening authority, and action thereon may be taken by the officer who convened the court, an officer commanding for the time being, a successor in command, or by any officer exercising general court-martial jurisdiction.

Very little exists in the legislative history for this particular provision other than its derivation from the Articles of War. During the Senate subcommittee hearings, the purpose of Article 60 was explained by Senator McCarron, Chairman of the Committee on the Judiciary, in a letter to Senator Tydings as follows: "The first review after the court-martial is the convening authority or his successor or any officer exercising general court-martial jurisdiction (art. 60). The commentary states that this particular reviewing powers vests in the office, not the convening authority." S.Rep. No. 486, 81st Cong., 1st Sess. 112 (1949) (citation omitted). A minor change was made to Article 60 in 1956,[5] and there-

---

2. The operational chain of command extends upward beyond the joint commander and the ultimate superior is the Commander-in-Chief of the Armed Forces, the President.

3. Uniform Code of Military Justice, Pub.L. No. 506, 64 Stat. 108 (1950).

4. The Articles of War, Pub.L. No. 759, 62 Stat. 634 (1948).

5. This minor change resulted in the following provision: "After a trial by court-martial the record shall be forwarded to the convening au-

after it remained virtually unchanged until 1983. In 1983, Congress amended Article 60 resulting in subsections 60(c)(1) and 60(c)(2) quoted by the majority. Pertinent to the issue at hand is the portion of Article 60(c)(1) which provides for someone to act in place of the original convening authority and states: "Under the regulations of the Secretary concerned, a commissioned officer commanding for the time being, a successor in command, or any person exercising general court-martial jurisdiction may act under this section in place of the convening authority." This language essentially parrots that of the original Article 60 with the exception of the addition of the language which purports to give the service Secretaries the authority to issue regulations in this area.

Clearly, under the Uniform Code of Military Justice, from its inception in 1949, until 1983, Article 60 permitted *any* officer exercising general court-martial jurisdiction to take initial action on the record of trial in place of the original convening authority. What, then, was the intent of Congress in amending this article by authorizing the service Secretaries to promulgate regulations? The legislative history of the Military Justice Act of 1983 is silent with respect to this specific change. The analysis to the rule implementing this article, Rule for Courts–Martial (R.C.M.) 1107, Manual for Courts–Martial, United States, 1984, is silent as well. The general intent of the Military Justice Act of 1983, was to enhance the quality, effectiveness, and efficiency of the Military Justice System, S.Rep. No. 98–53, 98th Cong., 1st Sess. 1 (1983); H.Rep. No. 98–549, 98th Cong., 1st Sess. 1 (1983), U.S.Code Cong. & Admin.News 1983, p. 2177, and to "streamline the pretrial and post-trial review process while not depriving military members of any of their fundamental rights." *Id.* at 13. The general legislative history concerning the amendment to Article 60, in particular, emphasizes the elimination of the cumbersome legal review which preceded the convening authority's action, indicates that the requirement for the convening authority to act on the case is retained, and stresses that the convening authority's primary role is a determination of whether the sentence should be reduced as a matter of command prerogative (such as for clemency purposes). *See* S.Rep. No. 98–53, 98th Cong., 1st Sess. 17–21 (1983); H.Rep. No. 98–549, 98th Cong., 1st Sess. 14–15 (1983), U.S.Code Cong. & Admin.News 1983, pp. 2177, 2179, 2180.

In my view, the unexplained language permitting the Secretary to issue regulations could only have been added for one of two reasons. Either Congress intended for the service Secretaries to restrict the long standing authority of all officers exercising general court-martial jurisdiction to act in this area or they intended that the Secretaries have the option to assign the responsibility to a specific general court-martial convening authority to ensure that the action was taken, without limiting the taking of the action to that same authority. I believe the latter rationale is most consistent with the expressed intent of the Military Justice Act of 1983 to increase the efficiency of the system and to streamline the post-trial review process. Restricting authority in this area accomplishes neither of these goals.

In my judgment, the recent holding by the U.S. Army Court of Military Review in *United States v. Simpson,* 33 M.J. 1063 (A.C.M.R.1991), is consistent with this interpretation. The facts in *Simpson* are much like the facts in this case. The general court-martial convening authority referred charges against the accused but deployed to Saudi Arabia prior to the convening authority's action being taken. A substitute general court-martial convening authority took the action.[6] The Army Court held that the action was properly taken

---

thority, and action thereon may be taken by the person who convened the court, a commissioned officer commanding for the time being, a successor in command, or any officer exercising general court-martial jurisdiction.

6. This general court-martial convening authority had assumed command over all residual units not deploying for Operation Desert Storm/Shield, a situation identical to the one in this case.

pursuant to Article 60, UCMJ, and R.C.M. 1107. The only factor which distinguishes this case from the case at hand is the fact that the Army Court noted that the Secretary of the Army had not prescribed any regulations in accordance with Article 60. This reaffirms the ability of any general court-martial convening authority to take a substitute convening authority's action in the absence of Secretarial regulations. More importantly, however, it demonstrates the absurdity which would occur if my interpretation is incorrect. If that were the case, the military justice system would work for the Army during a crisis or wartime situation but would come to a standstill for the Marine Corps participating in the same crisis or war. I do not believe this was ever intended by Congress when Article 60 was amended.

Even if Article 60 is interpreted as allowing the Secretary to restrict the power of general court-martial convening authorities to act in this area, I would nevertheless uphold the convening authority's action in this case on another basis. Contrary to the conclusion by the majority, I believe that *United States v. Yates*, 28 M.J. 60 (C.M.A. 1989), is directly analogous to this case. Although *Yates* dealt with the amendment of a convening order prior to trial, as opposed to action by the convening authority following trial, both deal with designations by the Secretary and subsequent actions which were apparently inconsistent with these designations. In *Yates*, the Secretary of the Army designated the Commanding Officer of Fort Sheridan as a general court-martial convening authority. The amended convening order was signed by the acting post commander in the absence of the commander, however, there was an apparent violation of service regulations in that the person assuming command was not the most senior officer present for duty. The Court of Military Appeals, as it had done in *United States v. Jette*, 25 M.J.

16 (C.M.A.1987), found that no jurisdictional significance should be attached to a violation of service regulations and that "[t]he realities of command, not unexecuted technical possibilities, best satisfy the purpose of these statutes." *Yates*, 28 M.J. at 63 (citation omitted).

In this case, the Secretary designated that substitute action should be taken by the general court-martial convening authority *over the command*. Who is "over the command", however, is a function of the chain of command and the chain of command is established by service regulations.[7] The fact that the Commanding General of the 1st Marine Division considered the Commanding General, Marine Corps Base, Camp Pendleton, to be "over his command", or at least over the appellant, for purposes of taking the convening authority's action is simply a violation of service regulations, akin to the situations in *Yates* and *Jette*, and no jurisdictional significance should be attached to this violation. The majority's holding that this defect is jurisdictional is the technical solution which the Court of Military Appeals warned against. I specifically find that no prejudice occurred to appellant in this case. In fact, the general court-martial convening authority who acted in this case was collocated with the appellant and in the best position to evaluate the appellant's post-trial performance and to grant clemency if appropriate.

The bottom line in this case is that the commanders did what was reasonable and practical in order for the military justice system to function in a crisis situation, the magnitude of which we had not faced since Vietnam. The "realities of command" dictated that it was not feasible to send this case or the many others from Camp Pendleton and Camp Lejeune[8] to the original convening authority or his operational superiors in Saudi Arabia, nor was it feasible

7. The Marine Corps Manual establishes the chain of command for nondeployed units and Joint Chiefs of Staff publications set forth the chain of command for units deployed under a joint command.

8. II Marine Expeditionary Force deployed to Saudi Arabia several months after the deployment of I Marine Expeditionary Force. A similar Memorandum of Understanding was executed with the Commanding General of Marine Corps Base, Camp Lejeune, with respect to the Marines left in the rear.

**614**

to send these cases to the administrative superior, the Commandant of the Marine Corps, in Washington, D.C. To have done so would have brought the system to a standstill in the case of all nondeployed Marines.[9]

Questions have often been raised as to the viability of the Uniform Code of Military Justice in crisis and wartime settings. Lieutenant Colonel Gary D. Solis in his book *Marines and Military Law in Vietnam: Trial by Fire,* posed the question, "Did the Uniform Code of Military Justice work in Vietnam." The answers were mixed but some very senior officers expressed doubts. Two former Marine Directors of the Judge Advocate Division [10] believed the system failed or was far less than satisfactory. A former Judge Advocate General of the Army [11] and General William C. Westmoreland stated: "It is our conclusion that the Uniform Code of Military Justice is not capable of performing

its intended role in times of military stress." [12] Unfortunately, these doubts appear to be confirmed by the holding of the majority in this case—we have a military justice system which works well in peacetime but one which does not work well if we go to war. I do not believe that this was ever intended by Congress or the Secretary of the Navy.

I find no defect in the convening authority's action in this case. Accordingly, I would review and decide this case in accordance with Article 66, UCMJ.

Senior Judge JONES concurs.

---

9. An argument can be made that a "quick fix" was available in these cases—informing the Secretary of the Navy that a problem existed with courts-martial cases of Marines left in the rear. The Secretary could have then promulgated the necessary regulation to authorize the base commanders to act in these cases. One would expect, however, that the military justice system was enacted by Congress with the intent that it function during wartime without the need for any "quick fixes" by the service Secretaries or anyone else.

10. Brigadier General Faw, USMC and Brigadier General Tiernan, USMC.

11. Major General Prugh, JAGC, USA.

12. Solis, Lieutenant Colonel Gary D., *Marines and Military Law in Vietnam: Trial by Fire,* p. 242.